Mr. Justice Cox
delivered the opinion of the Court:
It appears that at a place called Four Mile Run, some 4 miles south of the Long Bridge, on the road to Alexandria, the Alexandria and Washington Railroad passes through a culvert. The culvert is not wide enough to admit of two tracks and consequently the two tracks approach the tunnel and converge and interlace at that point, so as ■virtually to become only one track. Just after passing .through the tunnel they separate again into the two .original tracks. On either side of the tunnel there is, ior was, an arrangement for automatic electrical signals, the .operation of which is, that when one train approaches the tunnel, if the device is in working order, it will exhibit a .red light on the opposite side of the tunnel as a warning to the other train which approaches, that the other track is ¡already occupied. If the track is not so occupied when a train approaches, it will show a clear white light.
The plaintiffs in these cases were postal clerks in the service of the United States, and on February 19, 1885, about *182 10 o’clock in the evening, they were on a train of the Virginia Midland Railroad Company which -was coming north and approaching the tunnel. A fast freight train, said to-be under the direction of the Alexandria & Fredericksburg Railroad Company, was going south and approached the-tunnel at about the same time. The narrowness of the-tracks in the tunnel, of course, makes it necessary, under these circumstances, that one train shall stop and allow the-other to pass through. There is conflicting testimony as to-the condition of the signal arrangement on this occasion ; that is to say, as to whether it was in working order or not.. At all events, neither train did stop. The north-bound train approached the culvert, and the engineer of that train observed the other train on,the northern side of the tunnel, but supposed that it was stationary and did not stop. He-soon afterwards discovered, however, but too late, that it was in motion and approaching. Instead of stopping he-put on all his steam for the purpose of rushing through the tunnel and getting on to the double track before the other train could reach the point where the tracks diverge. He miscalculated, however, and the result was a fearful collision, in consequence of which a number of people were killed,, and these plaintiffs very seriously injured.
They brought suit against the Pennsylvania Railroad Company, the Baltimore and Potomac Railroad Company,, the Virginia Midland Railroad Company, Alexandria and Fredericksburg Railroad Company, and the Alexandria and "Washington Railroad Company. The declaration alleges, that the defendants wei’e running a through line from Baltimore to Quantico, in Virginia, and that they were operating these roads upon joint account, dividing the profits and being a species of partnership, with a partnership liability between them — not strictly a partnership, but at least a joint liability — so that all the.officers and employees on any one of these roads were in fact the agents of all these companies, and that these companies were, therefore, all *183 responsible for the damages resulting from the negligence of such agents or employees. The suit was brought originally against all these railroad companies upon that theory.
Upon the trial a great deal of testimony was given, much of it of a circumstantial character, and a great many instructions were asked, and the result of it was a verdict in favor of the Virginia Midland Railroad Co., and against all the other companies, in favor of one of the plaintiffs for $15,000, and in favor of the other for $10,000. The cases come before us on a motion for a new trial on sixty-four bills of exception.
It is hardly necessary to say that to discuss these in detail would be an endless task. I think, however, that the instructions may be classified and may be considered in groups, so to speak. The body of the instructions actually given by the court will be found'in the charge to the jury, and I do not know that I can do better in this case than tó examine the testimony set out in the bills of exceptions and compare it with the charge and ascertain how far the testimony justifies the charge, and afterwards consider the exceptions.
The first effort was to prove the solidarity of interests between the Baltimore and Potomac Railroad Co., the Alexandria and Washington Railroad Co., and the Alexandria and Fredericksburg Railway Co., and sundry items of evidence were offered with that view. For example, Mr. Wilkins, who was the receiver of the Alexandria and Washington Railroad Co., was examined, and testified, as appears from the record on page 219, that when he was appointed receiver he found in existence certain running arrangements between the Alexandria and Washington, Alexandria and Fredericksburg, and Baltimore and Potomac’ railroads by which they prorated their expenses and earnings and were operated by the same operating officers and agents, and that he continued such arrangement. Again, on page 225, he says: “The rights of the Alexandria and. Fredericksburg Rail *184 way are somewhat difficult to define, because there has never been any written contract between the respective interests. The Baltimore and Potomac, the Alexandria and Washington, and the Alexandria and Fredericksburg roads have a ■community of interests south of Washington, which make it most economical and desirable to operate as one interest, although an accurate subdivision of both, earnings and expenses has at all times been made from the books of the auditor and treasurer He has stated the same in his testimony in another case, and is asked if it is correct, and he says, “Yes, sir; that is correct.”
Another circumstance offered in evidence was, that the employees of all three of these roads were paid by the same common agent from a pay-car that started from the east— that is, from Baltimore, and went all along the lines and paid the men employed on these different roads. Another circumstance adverted to is the advertisement of travel over these roads, which I shall have occasion to refer to in another connection. It is called the Great Pennsylvania Route, and embraces all these roads. Still another circumstance which is not without its weight,probably, is that the officers of the three roads would seem to be employed interchangeably upon these different roads. As an illustration of that, we are referred to the fact that this very freight train which came into collision with the passenger train was officered by parties on the roll of these different companies. The engineer and fireman of the freight engine, at the time of the collision, were both on the pay-roll of the Baltimore and Potomac Railroad Co. for the months of January and February, 1885, and the conductor and brakeman were on the pay-roll of the Alexandria and Fredericksburg for said months. One of the brakemen on the freight train, who had been on the line for about eight or nine mouths prior to the accident, had been braking on the trains in the yard at Washington and on the line from Baltimore to Quantico, &c. It is also testified that in the running of trains on all *185 parts of the roads from Washington to Quantico, in the operation of said roads from Washington, employees of one company used the rolling stock of the other companies, and engines of one company hauled cars of the others.
Very little importance should be attached to the circumstance that the cars of one company are on the roads of ether companies, because that is an arrangement existing all over the country. But when we find that the officers ■on the pay-rolls of these different companies seem to be •acting together, sometimes on the same train, it bears very much the appearance of an operation on joint account. Another circumstance relied on is the fact that Mr. Sharp, of -the Baltimore and Potomac Railroad, had charge of these automatic signals on the Alexandria and Washington Road. According to the testimony he had charge of the trainmen •all along the line of these three roads.
These are circumstances offered to the jury with a view of showing a joint interest in the operation of these three roads on the part of these companies. There are undoubtedly arrangements between companies having connecting lines that do not involve in any way a joint liability. For the convenience of the public, for example, the passenger is allowed at one end of a series of connecting lines to purchase what is called a coupon ticket over, the whole line, and to pay his fare in one sum. That does not amount to anything like a partnership or import a joint obligation which the companies assume. In that case, each coupon represents simply the fare over one of the connecting lines. In that case, each company receives simply the fare over its own line. It pays its own expenses out of its own earn•ings, and has no interest in anything but the proportion of the fare which the coupon represents. But when companies having connecting lines agree to divide their earnings and their expenses also upon some basis such as that of trackage or mileage, or of the value of stations and other property, quite a different aspect of affairs is presented. It *186 may be, for instance, that one of such companies has to pay a much larger expense per mile than the other, and if the expenses are prorated according to the mileage, it would follow that it would be taking from the earnings of the-other companies. And so, if it paid much less expense than the others, it would be giving to them. This gives each company a direct interest in the business of the other roads. It does not constitute a commercial partnership, and we do not suppose that several railway companies could enter into a commercial partnership which would involve a joint liability for all debts and obligations of every description of each company, or necessitate the joining of them all in an action sounding in contract;, but here there was shown a joint interest in the transactions and in the earnings of a particular service, and therefore each company and its agents would, in the prosecution of that business over its lines, be the agents of all the other's as well as acting in its own interests.
Therefore, it would follow, that each company would be liable for the negligence of those agents.
There is a question made in argument, how far it is possible for several connecting railroad companies to enter into an arrangement of this sort. We have been referred to a case in 21 Howard, in the Supreme Court, to show that two independent companies could not consolidate themselves into one. That is no doubt true, unless it is provided for by the statute. ' But at the same time the Supreme Court recognized the rule as generally prevailing and recognized by State authorities, that one company may contract for the transportation of goods beyond its own line and becomes responsible for their safe transportation, and the same is true as to passengers. If they can do that,, it is pretty difficult to define exactly the limits of their capacity to contract beyond their own lines. The moment a train passes from one road to another, according to the-custom, it passes into the control of the officers of that road, *187 and yet if the original company has assumed that liability,, it is not affected by the fact that on each road the general control over the train is exercised by the officers of that road, who become pro hac vice those of the company which contracted to transport safely over that road beyond its own line.
In the case of Insurance Company vs. The Railroad Company, reported, in 104 U. S., there is a squinting at this sort of an arrangement, although the question was really not involved in that case, where it was sought to make several connecting lines of road all responsible for an injury sustained on one of them. That contention was not sustained. Judge Harlan in his opinion, speaking of the arrangement that did exist, said :
“ Such an arrangement did not, in our opinion, involve joint liability upon the part of the railroad companies, or make them partners either inter sese or as to third persons. Each company bore the general expenses of its own route and of all transportation over it. The division, upon the basis-merely of distance, of the aggregate pay for the entire route covered by the roads of these companies gave each one no greater amount than perhaps it tvould have earned had the dispatch company contracted with each, separately, for the transportation of the cotton.”
That is to say, where there was no division of the general expenses, and each company took its share of the fare and attended to its own expenses, there was no liability. Now,, the converse of that proposition is not asserted ; but there is room for an implication that the division of expenses as-well as of the gross earnings might involve this joint liability.
As to the right of corporations to make arrangements of that sort we find a series of cases referred to in the late-work, Morawitz on Corporations, in which it is said — and I read from Section 220, 221 and 222:
“ Sec. 220. The management of the affairs of a corporation. *188 cannot be taken out of the hands of its regularly appointed and responsible agents and transferred to the agents of another company. It follows, therefore, that a corporation cannot enter into a co-partnership even to further its proper enterprise. For the existence of a co-partnership would not only interfere with the management of the corporation by its regularly appointed officers, but would control the authority of the stockholders themselves and involve the corporation in new responsibilities.
“ Sec. 221. It is well settled that a railroad company may, without express authority in that behalf, make contracts to convey passengers and freight to points beyond the limits of its own line, and as a necessary incident to this right it may make contracts with other carriers for the regulation of their joint business.
“In practice it is often difficult to determine whether a traffic arrangement between two companies be authorized by their charters or not. Each case must depend largely upon its particular circumstances. But the general principles which govern are clear. A corporation cannot enter into a partnership, nor can it delegate any of its franchises to another company, whether by a sale, a lease, or a mere license. And it is settled that the enterprise for the prosecution of which a corporation was formed cannot be extended beyond the limits fixed by the company’s charter. But all corporations have implied authority to enter into contracts for the purpose of attaining their legitimate objects; and accordingly, railroad companies may make any reasonable arrangements with each other for the purpose of regulating and increasing their legitimate joint traffic.
“Sec. 222. Thus it has been held that railroad companies owning connecting lines may, by contracts between each other, fix the time of running trains and the rate to be charged upon transportation. ‘The companies may agree, and individuals may agree, to certain rates of transportation which may be considered mutually advantageous. *189 Neither company has parted with its corporate power; each, acts for itself and under its own power of fixing the rates-for transportation, and they both agree that the charge shall, be uniform throughout the line.’ ‘Agreements between companies owning connecting lines providing for a division, between them of all their earnings derived from joint traffic-upon fixed proportions are authorized; and an agreement, of this kind may be valid, although a larger portion of the joint earnings be given to one company than is in proportion to the work which it has done.’ ”
Now, if a company can contract to carry passengers and freight safely beyond its own lines, it cannot, of course, do-that without the consent of the connecting companies, and upon such conditions as they may prescribe; and I do not see why one of the conditions upon which the companies may agree that their lines shall be used interchangeably may not' be that the general expenses of the whole traffic,, as well as the earnings, may'be apportioned among them; and if that is done, then, as I have endeavored to show, it establishes an interest in each company in the traffic over each line and makes the agent of each company the agent of all for the purposes of conducting that business.
The charge of the justice below on this point, at page 165 of the record, is as follows:
“ The Baltimore and Potomac Company has shown, by its charter, that its road proper stops at the south end of' the Long Bridge. But it is claimed by the plaintiffs that several years before the occurrence of the collision an arrangement was made by the Baltimore and Potomac, the Alexandria and Washington, and the Alexandria and Fredericksburg railroad companies, which was in force at the time- of this accident, by -which these three companies were to have a community of interest in operating the three roads as a single line in the business of transporting freight and passengers. It will be your duty to carefully consider-the testimony relating to this claim, thus-made, and if you *190 find therefrom that there was an arrangement hy which the ■several trains run by each company over these roads were in the interests of all, each contributing to the expense and ■sharing a portion of the profits, as they might be determined by a common agent, according to rule agreed upon by them, each company would be liable for an injury occurring by the negligence of the employees on any one of such trains, if under the particular circumstances the injured party, as a matter of law and fact, be entitled to a recovery from either party. This inquiry and direction has fitting application to the fast train south bound which was in collision, inasmuch as it started from Baltimore to run over the entire road of each of these companies to Quantico. You will look to the evidence for the purpose of determining, as far as you may, whether it came within any such alleged ■arrangement by plaintiff, as I have already mentioned. To determine-whether there was any such arrangement it wall be proper for you to inquire whether the evidence shows that trains run over the tracks of these three companies to transact their business were made up of cars or locomotives belonging to one or two or three of the companies indifferently, as might be convenient, and whether the employees running and having charge of such trains were those of either of the companies as might be suitable or convenient for the occasion; whether the general manager, superintendent, train-master, and other officers having control of the business were the same persons, and whether such officers in fact conducted the business on and over the roads of these three companies as a single business of that line, so far as the public had opportunity of knowing, the accounts being kept by a common agent, who made a division of expenses and profits between these companies according to an arrangement understood by and known to each of these companies and their privies, but unknown to the public, including the plaintiffs.
“ If you shall find these several inquiries in the afirma *191 live, then as to these plaintiffs, it will be your duty to regard these defendant companies as joint principals, each having an interest in the trains so run upon said line, and jointly and severally liable for the negligence of any of the employees upon any of such trains, provided you shall find that the Alexandria and Washington Railroad Company is properly sued in this action, from the evidence and under' instructions already given.”
Some criticism has been made upon this part of the charge which refers to the probability that the public did not know of any arrangement other than that which appeared upon the face of things; but I think that is justified by the language of the Supreme Court in the ease to whicli I shall refer presently, of the Railroad Company vs. Brown, 17 Wall., 445.
This expresses the law, as we understand it, upon the facts which had been given in evidence to the jury if the jury could infer therefrom the fact of. the joint interest of all these companies in this business; and it seems to us that the facts which were testified to were sufficient to go to the j ury. It is, of course, a matter of judgment what conclusion should be drawn from them, but we think that they were sufficient prima fade evidence to lay before thé jury, and if the jury found the joint interest of all these companies, the law is properly stated by the court in its charge.
At the trial, there was an effort on the part of the other companies to throw the burden of this loss upon the Virginia Midland Co., by showing that the negligence of the engineer on that train was the real cause of the accident. The name of the engineer was Bruce. It turned out upon the proof, that if-there was a combination of all these other companies, the Virginia Midland was not in that combination. They simply paid a certain compensation for the use of the roads and for the privilege of passing their. trains over the other roads. . They had no participation in the earnings of the other companies. If, however, the engineer of that train *192 was negligent and the accident was attributable to that negligence, it is vei’y true that this railroad company would be responsible equally with the others, and the judge so-instructed the jury.
But it further appears in the case that, when that train reached the track of the Alexandria and Washington Road it was under the supreme control of another person — Mr. Bennett, who was called a pilot, representing the Baltimore and Potomac Railroad and the Alexandria and Fredericksburg Road, or the combination, as the case may be — representing other companies, at all events; that he had so far the actual control of the train that he- might direct it to go or stop. If that be true, the court was right, we think, in saying that whether the Virginia Midland Company was responsible or not, the parties represented by Mr. Bennett would be equally so.
The jury found substantially, as we infer, that Bruce was not in fault, and that the accident was not to be attributed to his negligence and exonerated the Virginia Midland Company.
The next question is, how far the Pennsylvania Railroad Company is to be connected with this combination, with these other roads, the Baltimore and Potomac, Alexandria and Washington and the Alexandria and Fredericksburg. A number of circumstances were offered in evidence tending to show that behind the Baltimore and Potomac, if not behind the other two roads, stood the Pennsylvania Railroad Company as -the active manager of all. I believe the Pennsylvania Railroad Company owns the majority of the stock of the Baltimore and Potomac, and perhaps all of its bonded indebtedness, amounting to nearly $2,000,000, and all the bonded indebtedness of the Alexandria and Fredericksburg Company, amounting to $1,000,000. These facts alone, however, would not be sufficient to establish an identity between the Pennsylvania Company and these companies, because any creditor of the road, or any stock *193 holder, would be in the same relation, and the circuinstalled alone of being a creditor or stockholder would not make the Pennsylvania Company any more liable than any individual stockholder. And so the judge-told the jury; but he said that these circumstances might be offered in evidence in connection with other circumstances, and that if there was evidence tending to prove that the Pennsylvania Railroad Company, in its corporate capacity, and not as a creditor or stockholder, did exercise control over any of these companies, directing its business, controlling it and managing it, then it would follow that the company was really identified with them in interest and also in responsibility.
The first evidence offered on this subject on the part of the plaintiff was the testimony o.f Mr. Barbour, who ivas formerly the president of the Virginia Midland Railroad Co., which showed the arrangement by which the trains were run over these roads, and that it-was made directly with the chief officers of the Pennsylvania Railroad Company. He said, in answer to a question: “ So far as the contract was made, it was an entirety with the Pennsylvania Railroad people from Alexandria to Washington. There was no division when the matter was discussed with Mr. Roberts and the principal officers of the Pennsylvania Road. There was no discussion as to who owned the road between Alexandria and the south end of the Long Bridge, or who owned the line from the south end of the Long Bridge to the Sixth street depot. We discussed it as an entirety, as property under the control of the Pennsylvania Railroad Company. They were running the Baltimore and Potomac, and they were running a through line from Neiv York to Quantico in the latter part of the period.
Q. The Pennsylvania Railroad Company were ?■ — A. Yes, sir ; the Pennsylvania authorities. I would not say the Pennsylvania Company in its legal sense. There might have been some parties interposed, but I dealt, as the chief executive *194 officer of the Midland, with these gentlemen. They divided the road from Alexandria to Washington, as I understand it. These gentlemen had some division.
Q. The arrangement that you did make for the privilege of running your trains from Alexandria into Washington over the Washington and Alexandria track and the Baltimore and Potomac track teas made with the authorities of the Pennsylvania Railroad Co. ? — A. Originally, yes, sir.
Q. What I want to' know is, if you remember whether your company was to pay anybody anything for the privilege of running your Midland trains from Alexandria to Washington and back, or whether they gave you that privilege for nothing. He answered: “No, sir; I stated in the beginning that we were to pay a per capita, I think 35 cents for each passenger, and so much on freight for each car load, or by the ton.”
Q. “And that arrangement was made with Mr. Scott, the president of the Pennsylvania Railroad Company ? — A. With Mr. Scott and Mr. Roberts. I think originally with Scott and later with Roberts, with some modifications."
He amplifies this same idea in other parts of his testimony, which I think it is hardly necessary for me to repeat more at length.
And there was offered in evidence a report of the board of directors of the Pennsylvania Railroad Company, which is found on page 107 of the recoi’d, being the report of March 2, 1885, in which the board of directors submitted their report for the year 1884, “ with such data, relating to the lines controlled by your company as will give you a clear understanding of their physical and financial condition.” It commences :
First.'The Pennsylvania Railroad division.
Second. The Baltimore and Potomac Railroad connects your lines with Washington and the South.
Then comes the Alexandria and Fredericksburg Railroad:
“ The Alexandria and Fredericksburg Railway is still oper *195 <arted by trustees. Its results show an improvement over the preceding year.”
The report of March 1, 1886, found on page 190 of the record, contains the same expression.
“ The Baltimore and Potomac Railroad Company connect .your lines with Washington and the South.”
This is not, of itself, conclusive, but still it is an indication in the direction of assertion of control by this company over the Baltimore and Potomac and the Alexandria and Fredericksburg roads.
Again comes the advertisement, which I referred to a little while ago, of the Great Pennsylvania Route to the North, West, and Southwest. Then it goes on to say that trains leave Washington from the station at the corner of Sixth and B streets, for Chicago, and they leave for Alexandria.
Then it refers to the Alexandria and Fredericksburg Railway and the Alexandria and Washington Railroad, and says: “ Tickets and information at office, northwest corner of 13th street and Pennsylvania avenue, and at the station, where orders can be left for the checking of baggage, for hotels ■and residences; signed, Charles E. Pugh, General Manager; J. R. Wood, General Passenger Agent.” These same persons are the general manager and general passenger agent of the Pennsylvania Railroad Company.
Perhaps one of the most important facts is the sale of tickets over the roads by the Pennsylvania Railroad Company. As I stated a little while ago, where a company sells a coupon ticket over its own route and connecting lines, there is no great importance attached to' that fact. It sells the ticket then as the agent for the other roads. But the Pennsylvania Railroad Company has an office herein Washington, and it sells tickets from Baltimore to Quantico over the Baltimore and Potomac and other roads, beginning at a point separated from its own road proper, which runs from Philadelphia to Pittsburg, by all of the distance between Baltimore and Philadelphia. It sells tickets from Washington to the South — that is to say, over roads separated by *196 a hundred miles from its road proper. It-seems to be very-singular that a company should be doing that, which had no interest in the business which it was thus managing-It is not like selling over its own road and then over connecting- lines; but it acts independently of any such connection, and although it does not work the lines directly in its own name, yet it has an office, and by its agent sells tickets over these roads and receives the money for. them,, making some division afterwards. That is a very strong fact to go the jury to indicate some participation in the-business of these roads and control over them.
Another quite significant fact was, that the Pennsylvania Railroad Company made a claim on the Washington and Alexandria Railroad for its proportion of damages for the-destruction of merchandise in this very collision. There was an attempted explanation of this, but it was not clearly testified to. There was an intimation that the Pennsylvania company had assumed some responsibility for the freight, on its own lines and then was seeking to reclaim what it had to pay to the other roads. If that had been so, it would be entitled to claim the whole damages from the other road, if they were entirely independent in their business dealings ; but that was not the case. It sent a bill to the Washington and Alexandria Railroad Company, for its prop>ortion of the damages occasioned by this collision. That implies, of course, that somebody else has to hear a proportion of the loss, and that the first company, if it paid damages, would have its proportion to pay. That is a somewhat significant fact in the direction of showing joint responsibility, as it appears to us.
Another fact relied upon was, that the mail pay received by the Washington and Alexandria Railway Company from the Government was divided up amongst these three roads and that there was a meeting of the directors of that company authorizing that money to be paid into the hands of Lieb, as co-treasurer for all of these companies, and that *197 the meeting took place at the office of the Pennsylvania .Railroad Company in Philadelphia.
All of these circumstances were submitted to the jury, •■and we think they are sufficient prima facie evidence to go to the jury as indicating the identity of the Pennsylvania Railroad Company with the whole combination, as you may express it, or with the Baltimore and Potomac Road, and that in- fact they were running the Baltimore and Potomac Road.
The charge of the justice on that subject is found on pages 271 and 272 of the record. He says:
“As to the liability of the Pennsylvania Railroad Company, I give you in charge the following prayer of its •counsel:
“ In determining the question as to whether or not the Pennsylvania Railroad Company is liable for the injuries ■complained of in these causes, the jury cannot infer such liabilities from the fact, if the jury should find it to be a fact, that the said defendant was at the time of the accident •complained of the owner of the stock or bonds issued by •either of the other defendant corporations. (Such ownership cannot be considered as evidence tending to establish or prove such liability.)”
That is all given except the last sentence. I think that observation would be misleading and would require ■comment. The fact that they owned the bonds and stock might be, and I think properly, competent evidence to the .jury in this case. These circumstances are to be considered with all the other circumstances on which the jury are to ■determine whether or not the Pennsylvania Railroad Company has any such interest in this case, as will hold it liable and responsible to the plaintiff.
Neither will it be sufficient to show in addition that the directory of the Pennsylvania company and that of the other defendant companies, except the Virginia Midland, were composed, to a greater or less extent, of the same, *198 or that some of the officers of the Pennsylvania company-were the same, as in the other defendant companies. In order to find that the Pennsylvania company is liable in this case, you should find that there was some actual, arrangement by which the Pennsylvania company was-interested with the other companies, other than the Virginia Midland Company, in running the trains over this road,, which the other companies, except the Virginia Midland Company, were interested in; or you must be satisfied from the evidence that by reason of some arrangement or condition of things, the Pennsylvania company had the-right as between the parties, as a corporation, to, and did,, issue any order or regulation that it chose to those who-were engaged in running trains on the Alexandria and Washington Railroad in relation thereto, and that such order and regulation which when made were accepted and obeyed. If satisfied of this by evidence which to your minds establishes the fact by a preponderance of evidence,, you will return a verdict against the Pennsylvania Railroad Company. If you find that those who were operating the trains which met in the collision were guilty of negligence and were the same companies that you find were so subject to the orders and regulations which were made by 'the Pennsylvania Company, you are not to act upon surmise or suspicion, but evidence direct or circumstantial sufficient to satisfy you of the existence of the facts, and if the evidence fails to establish the necessary facts, your verdict should be for the Pennsylvania. Railroad Company. Indeed, it is proper to say here that all facts necessary to be established in order that plaintiff may recover against any of the defendants should be established by a preponderance of the evidence.”
. It seems to- us that the evidence justifies the charge. The facts were sufficient to go to the jury; and if they did find the facts referred to in the charge, the charge correctly expresses the law.
*199 It is, pei’haps, not amiss here to remark that all of these circumstances seem, in our judgment, to point to at least the appearance of interest in and control by the Pennsylvania Railroad Company over this business, and that is strengthened by the fact that the defendants have made no effort to explain away what I might call the compromising circumstances. There was nothing easier than for the Pennsylvania Railroad Company and these other companies to show exactly what the arrangement was between them; to show what they got and that it constituted nothing but a division of the gross profits — of the gross fare received either for freight or passengers. But there was not the slightest attempt made to do that, and it seems to us a pretty strong justification for leaving to the jury the evidence which was submitted to them as a basis for their finding.
It was attempted, however, at the trial to show that the Alexandria and Fredericksburg Company were not liable to a verdict in this case, because the road was in the hands of trustees and not in the hands of the company itself. It does appear that the company executed a mortgage to secure $1,000,000 of bonds, and one of the provisions of that mortgage was that upon default the trustees shall, at the request in writing of the holder or holders of said bonds or any part thereof, have the right and power after giving thirty days’ notice of such default of the party of the first part in the payment of said interest as aforesaid, or in the payment of the principal sum when the same shall have matured, as aforesaid, to enter and take possession of said' Alexandria and Fredericksburg Railroad, together with all and singular the franchises, property, estate, equipments, buildings, shops, engines, and cars and every species of property, right, title, or interest belonging thereto, in whatever shape the same may exist, and also to take possession of all records, stock-books, account-books or vouchers for any money due the said company upon any instrument in *200 writing or from any source whatever, or that may be requisite to give information as to the affairs and real condition of said company, and the said trustees or their successors are hereby invested with power to enforce the delivery of the said books, vouchers and credits, or any part thereof. And said trustees, or their successors, may also, at their option, appoint a receiver, auditor, agent or agents, to conduct the affairs of sciicl road or to work the same for the benefit of the holders of said bonds or coupons so overdue or their assigns.
There is a question as to how far the company had the power to execute this mortgage ; but assuming for tbe purposes of the argument that they could execute it, if there had been a foreclosure of the mortgage and the road had legally passed entirely out of control of the company of course they were no longer liable to suit. But as long as the mortgage was not foreclosed the property was in the company, and if they did authorize the trustees named in this mortgage or their successors to enter upon and take possession of this road, and work the road, the latter necessarily did so as the agents for the company, and also for the creditors. The company could not, by putting its road in the hands of agents, whom they call trustees, exonerate themselves from responsibility for working that road. It does not appear, in point of fact here, that the circumstances ever arose which justified the trustees ill taking possession ; at least it does not appear that there was a default in the payments made, &c., and it does not appear that the trustees had the power under the mortgage to take possession of the road themselves. They were authorized to appoint a receiver to do it. And this was not done. They took possession themselves, and apparently without authority, but either with or without authority they took possession as trustees or agents of the company, and were their agents. The company could not divest itself of its property or responsibility by that operation in our judgment.
*201 The charge of the court on that point is found on page r264 of the record. The court says :
“ The Alexandria and Fredericksburg Railroad Company •also pleads that it was- not a common carrier on the road ■where the accident occurred, in addition to the plea of not .•guilty," and upon this trial it supports its plea by showing •that its road at the time of the accident and for some' time before, had been in the possession of trustees, by virtue of ■the provision of the deed of trust executed by the company to secure its indebtedness, the condition of which had be■come broken by the maturity and non-payment of the debt so secured. In order that the Alexandria and Fredericks-. burg Railroad Company may be acquitted of responsibility for this reason, it should, in any event, appear that, in fact, fhe business of management and operation of the road was ■conducted by the trustees to the entire exclusion of the •company, its officers and board of directors, and that it Aas ■so notoriously so that it may well be presumed to be known to the public.
Besides, it should appear that the trustees were not appointed by the procuration or assent of the railroad company ; for if so, the trustees would be as much the agents •of the company as the grantees in the trust deed. The ■Supreme Court of Appeals of the State of Virgiuia, in an .action brought against the Alexandria and Fredericksburg Railroad Company for personal injuries resulting from negligence on the road while in the possession of trustees, by virtue of the deed of trust, under conditions precisely similar to those shown in this case held that: “No provision is found in the charter of the defendant company or the general railroad law of Virginia which will authorize the companjr to transfer to trustees or to mortgagees under the deed of trust given as a mere incumbrance and security, the right and legal capacity to step into the shoes of the company and assume and exercise indefinitely the franchises, rights, and privileges of the company, so as to give, the company *202 exemption and immunity from responsibility for all injuries inflicted by the operation of the road by the trustees.” I quote this language for accuracy and convenience and adopt it and give it to you as the law in this case. It follows that the Alexandria and Fredericksburg Company cannot be excused from liability because of any possession shown in the trustees.”
On this question, too, we think the court was right, and we will refer in that connection also to the case of Thomas vs. The Railroad Company, 101 U. S., page 71, Pennsylvania Railroad Co. vs. The St. Louis, &c., Railroad Co. 118 U. S., 90, and Oregon Railroad Co. vs. Oregon, &c., 130 U. S., 110.
It is claimed on behalf of the Alexandria and Washington Road that it was in the hands of a receiver, and that it had no control over its own road, and should not be held responsible for anything that occurred upon the road. On this subject .the charge of tho court was:
“If you find from the evidence that the Washington and Alexandria Railroad Company was carrying the United States mail between Alexandria and Washington, and the plaintiffs were in charge thereof as postal clerks, duly commissioned and designated by the United States for that, duty, and the Alexandria and Washington Railroad Company was paid by the United States, by draft payable to the order of the agent of said company, appointed by its board of directors to. receive the same, and that the freight and passenger trains which collided and caused the injury to plaintiffs were running over said road in pursuance of arrangements made by the parties in control of said road, prior to the appointment of the receiver of said road, and if, when the receiver was appointed, he continued in office as superintendent, general manager, and treasurer, the same persons as had heretofore discharged the duties of these positions, and if the business of this railroad, so far as was known to the public, was continued in the same way, so far as the general public could know, as before, and was so *203 conducted at the time of the accident, and that the only substantial duty that the receiver discharged was to receive the net earnings of the road from the treasurer and to account therefor to the court by which he was appointed and if you shall find that the Alexandria and Washington Railroad is guilty of negligence from the evidence under the instructions of the court, your verdict will be against them and for the plaintiff. But if you are satisfied that the business of the' Alexandria and Washington Railroad, so-far as the Alexandria and Washington Railroad Company’s-interest was concerned, was conducted by the receiver after his appointment and at the time of the collision in question, in his own name and in such manner that it could be generally known by the public that he, and not the company, conducted the business and controlled the road and its management, and that he did so to the entire exclusion of any control or participation therein by the Alexandria and Washington Railroad Company, its officers and board of directors, then your verdict 'should be for the Washington and Alexandria Railroad Company.”
The evidence in this case tended to show that the only duty discharged by the receiver, after going through the-formality of sanctioning the appointments already existing of persons in the control of the business of that road, consisted in receiving the net earnings of that company, and that he took no personal part whatever in the management-of the company; that the management was continued in-the parties who had been in the management of the road in pursuance of the arrangement between these three roads,, of which I have already spoken.
It seems to us that under these circumstances, and that state of the evidence left to the jury, the charge was correct..
The case of the Railroad Company vs. Brown, 17 Wallace,. 445, appears to sanction this. That was an action against-a railroad company which had passed into the hands of a receiver, and the court said'
“ The second assignment of error denies the liability of *204 the corporation for anything done while the road is operated by the lessees and receiver. It is the accepted doctrine in this country that a railroad corporation cannot escape the performance of any duty or obligation imposed by its charter or' the general laws of the State by a voluntary surrender of its rights into the hands of lessees. The operation •of the road by the lessees does not change the relations of the original company to the public.
“It is argued, however, that this rule is not applicable where the proceeding instead of being voluntary, is compulsory, as in the case of a transfer of a possession to a receiver by the decree of a court of competent jurisdiction.
“ Whether this be so or not, we are not called upon to ■decide, because it has never been held that the company is relieved from liability unless the possession of the receiver is exclusive and the servants of the road wholly employed •and controlled by him.
“In this case the possession was not exclusive, nor were the servants subject to the receiver’s order alone. On the ■contrary the road was run on the joint account of the lessees and receiver, the servants employed and controlled by them jointly. Both were, therefore, alike responsible for the act complained of; and if so, the original company is also responsible, for the servants under such an employment, in legal contemplation, are as much the servants of the company as of the lessees and receiver.
“Apart from this view of the subject, the ticket on which the plaintiff rode was issued in the name of the Washington, Georgetown and Alexandria Railroad Company, as were all tickets sold at both ends of the route. The holder of such a ticket contracts for carriage with the company, not with the lessees and receiver. Indeed, there is nothing to show that Catherine Brown knew of the difficulties into which the original company had fallen, nor of the part performed by the lessees and receiver in operating the road. She is not required to look beyond the ticket which conveyed the information that this road was running, as railroads generally *205 are, by a chartered company. Besides the company having permitted the lessees and receiver to conduct the business of the road' in this particular, as if there ivas no change of possession, is not in a position to raise any question as to its liability for their acts.”
That part which I last read is important as bearing upon the objection I noted a little while ago, to the feature in the charge which attaches some importance to the circumstance that the public did not know of the change in the condition of these companies, with reference to the appointment of trustees and receivers.
On the facts testified to, if the jury believed them, we are-of the opinion that the court was correct i*n its charge in this respect, and that the company did not cease to be liable-by virtue of the fact that a nominal receiver was in receipt, of the net income that belonged to the Alexandria and Washington Railroad Company.
This covers the substance of the charge and the facts, as applicable to these three companies. The exceptions may be classified thus:
First. The first twenty-six bills of exceptions, as I remember, were to the admission of evidence offered on the part of the plaintiff, with perhaps one exception, and all of that evidence related to the particular facts and circumstances that I have referred to, and which we consider as having gone properly to the jury.
It might be remarked here that the court is really not bound to consider any of these exceptions because in not a single instance is any reason assigned for the objection made, and the Supreme Court has lately characterized that as an improper practice in the case of Woodbury vs. The District of Columbia. But we have taken the trouble to examine every one of these exceptions in detail, and it does. not seem to us that any of them are well founded, as to the admissibility of various items of evidence offered by the plaintiff. There is one exception, and that is the refusal of the court to admit evidence on cross-examination of one of the plaintiff’s witnesses which probably ought to have bee *206 ■admitted. It looks, on its face, as if there were error there. ■On the examination of the plaintiffs’ witness, a question was asked as to the duties of certain officers, and why certain officers were employed by the different companies. Rut it does not appear that anything was lost by this to the defendants. It was a part of their case, and they might have called some witness or any number of witnesses as to the same facts. It was open to them in that stage of the ■case to offer evidence for that purpose. We do not see, therefore, that any harm was done to them by the exclusion of this evidence.
Then there are some questions on the refusal to admit parol evidence in relation to the right of way and other questions of that sort, which we think were better established by the printed regulations of the companjL We do not think those objections well founded.
After that follows a series of exceptions to the prayers. Some of these prayers are already embodied in the charges of the court, and there is, therefore, no ground of objection on that score. The other instructions that were asked come in direct conflict with the charge in those very particulars, in which we are of opinion that the charge is correct, and therefore they must all be overruled.
The last group or class consists simply of exceptions to separate parts of the charge, which as a whole we approve, and therefore it is not-necessary to go into any detail as to them.
Therefore, upon the whole, we do not find any errors in the rulings of the court below that was of any prejudice to the defendant, and the motion for a new trial on bills of exceptions is overruled.
At the close of the testimony there is a general prayer that the plaintiff is not entitled to recover upon the whole evidence; but as we consider that evidence all proper to go to the jury, it follows that the exception could not be sustained.

The judgment of the court below is affirmed.